UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MARYGRACE A. CONEFF, *et al.*,

    Plaintiffs,

v.

AT&T CORP. *et al.*,

    Defendants.

CASE NO. C06-944 RSM

ORDER DENYING DEFENDANTS' MOTION TO COMPEL ARBITRATION

## I. INTRODUCTION

This matter comes before the Court on "Defendants' Amended Motion to Compel Arbitration Pursuant to the Federal Arbitration Act and to Dismiss Action." (Dkt. #133). Defendants argue that pursuant to a binding arbitration clause entered into between the parties, Plaintiffs must pursue their disputes through individualized arbitration. Defendants also argue that the Federal Arbitration Act preempts any state law defenses Plaintiffs can bring to the enforceability of the arbitration clause.

Plaintiffs respond that the arbitration provisions are unenforceable because they are substantively unconscionable. Additionally, Plaintiffs indicate that Defendants' preemption arguments have been rejected by the Ninth Circuit.

For the reasons set forth below, the Court agrees with Plaintiffs, and DENIES Defendants' motion to compel.

ORDER
PAGE - 1

## II. DISCUSSION

**A. Background**

The instant putative class action lawsuit was brought by several individuals across the United States against Defendants Cingular Wireless LLC ("Cingular"), Cingular Wireless Corporation, AT&T Wireless Services, Inc. ("AT&T Wireless"), and New Cingular Wireless Services, Inc. (*See* Dkt. #45, Second Am. Compl., ¶¶ 22-25). Plaintiffs, who were or are currently AT&T Wireless customers, allege that after Cingular merged with AT&T Wireless in October of 2004, Cingular deliberately degraded AT&T Wireless' network in order to induce AT&T Wireless customers to transfer their plans to Cingular plans, which they allege are generally more expensive and less favorable to customers. Plaintiffs also contend that Cingular's intention was to charge AT&T Wireless customers with various fees and costs in connection with those new plans.

Plaintiffs allege that Cingular's specific scheme was to encourage AT&T Wireless customers to "upgrade" to Cingular's network. These "upgrades" required customers to do one or more of the following: (1) pay an $18 transfer fee to Cingular; (2) purchase one or more new phones from Cingular; (3) pay $18 for a SIM chip to operate their current phone; and/or (4) enter into a new service contract with Cingular. Plaintiffs allege that AT&T Wireless customers who did not agree to such an "upgrade" were left with a choice to either fulfill their contract term with a degraded AT&T Wireless service, or pay a $175 early termination fee to cancel service.

Plaintiffs also allege that Cingular began charging an unnecessary and mandatory fee to all AT&T Wireless customers. As a condition for approval of the merger, the Federal Communication Commission required Cingular to keep AT&T Wireless' network in place until February of 2008. Significantly, Cingular offered its wireless services through a new and improved GSM network, whereas AT&T Wireless offered service through a TDMA/Analog network. Plaintiffs allege, however, that in July of 2006, Cingular began imposing a mandatory $4.99 monthly fee to any AT&T Wireless customer still using the TDMA/Analog network. Plaintiffs note in their complaint that major publications, including

the Wall Street Journal, reported that Cingular had "been spending next to nothing to maintain the [AT&T Wireless] network, leaving customers who don't upgrade [to the Cingular network] in the lurch." (Second Am. Compl., ¶ 35).

As a result of this conduct, Plaintiffs initiated the instant class action against Defendants in this Court on July 6, 2006. Plaintiffs assert claims under the consumer protection acts of 14 different states, the Federal Communications Act as codified by 47 U.S.C. §§ 201 *et seq.*, and several common-law doctrines. Plaintiffs also seek, among other things, a declaratory judgment that an arbitration provision contained in their contracts with Defendants is unconscionable and therefore unenforceable.

Defendants now bring the instant motion to compel arbitration on an individual basis, and to dismiss Plaintiffs' claims pursuant to the arbitration provision that Plaintiffs argue is unconscionable.[1] Although the exact wording of the various AT&T Wireless Service Agreements ("WSAs") that Plaintiffs entered into with Defendants has changed over time, the arbitration agreements have remained substantially intact. Each expressly requires customers to pursue their dispute in either individual arbitration or small claims court. The WSAs also preclude customers from bringing or participating in any class action, regardless of whether the action is brought in arbitration or in court. Counsel for Plaintiffs acknowledged during oral argument that the 2006 WSA controls in this case. This version of the WSA provides:

> YOU AND [CINGULAR/AT&T] AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. Further, unless both you and [Cingular/AT&T] agree otherwise, the arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of a representative or class proceeding.

(Dkt. #52, Decl. of Berinhout, Ex. 4 at 35; Dkt. #134, Ex. 23 at 124).

Defendants also contend that each WSA contains a choice-of-law clause selecting the Plaintiff's home state as the governing law. Defendants argue that under the law of each applicable state, the class-waiver provisions in the WSAs are neither procedurally nor

---

[1] It is noteworthy that Defendants' original motion to compel was filed on October 30, 2006. (Dkt. #51). However, due to extensive discovery and repeated continuances requested by the parties, the motion finally became ripe for review on March 11, 2009.

ORDER
PAGE - 3

substantively unconscionable.  The applicable state laws include: Alabama, Arizona, California, Florida, Illinois, Missouri, New Jersey, Virginia and Washington.

Alternatively, Defendants argue the Section 2 of the FAA preempts Plaintiffs' state-law unconscionability arguments.  Defendants suggest that the FAA preempts general principles of contract law such as unconscionability if those doctrines are employed in ways that subject arbitration clauses to special scrutiny.  Given the unique and "pro-consumer" nature of the arbitration agreements at-issue, Defendants contend that the Court should overlook any state-law standard that is at odds with the FAA's liberal policy in favor of arbitration.

Notably, and prior to the merger, Cingular was the second largest provider of wireless communication services in the U.S. in terms of subscribership with approximately 24 million customers, and AT&T was the third largest with over 22 million customers.  After the merger, in which Cingular acquired AT&T Wireless for $41 billion, the new consolidated corporation branded as AT&T Mobility became the largest provider of wireless services.  At the end of 2007, AT&T Mobility had over 70 million customers and reported approximately $42.7 billion in revenue.  (Dkt. #138, Decl. of Coluccio, Ex. Q).

**B. The Federal Arbitration Act**

It is well settled that Congress enacted the Federal Arbitration Act ("FAA") to "overcome judicial resistance to arbitration . . . and to declare a national policy favoring arbitration of claims that parties contract to settle in that matter."  *Vaden v. Discover Bank*, 129 S.Ct., 1262, 1271 (2009) (internal quotations and citations omitted).  The primary purpose of the FAA is to ensure that "private agreements to arbitrate are enforced according to their terms."  *Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Jr. Univ.*, 489 U.S. 468, 479, (1989).  The FAA clearly manifests a liberal federal policy favoring arbitration agreements.  *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 (1991).

Nevertheless, courts should consider "ordinary state-law principles that govern the formation of contracts" in determining whether the arbitration provision is valid.  *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (citations omitted).  Thus, "generally applicable contract defenses such as fraud, duress, or unconscionability, may be

applied to invalidate arbitration agreements[.]" *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996) (citations omitted). The party opposing arbitration bears the burden of showing that the agreement is not enforceable. *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91-92 (2000).

Here, the parties do not dispute that Plaintiffs' claims fall within the scope of the arbitration agreements in the WSAs. As a result, the Court must determine whether the arbitration agreements are enforceable.

**C. Applicable Law**

The first issue for the Court to determine is whether the choice-of-law provisions contained in the WSAs are valid. It is undisputed that the WSAs select the law of the individually-named Plaintiff's home state or the state of the wireless phone number. (Dkt. #133 at 19, n.8). Plaintiffs maintain, however, that applying the choice-of-law clauses would violate Washington's fundamental public policy against class-action waivers in arbitration agreements.

A court sitting in diversity, as is the case here, applies the choice-of-law rules of the forum state. *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1005 (9th Cir. 2001). In Washington, "there must be an actual conflict between the laws or interests of Washington and the laws or interests of another state before Washington courts will engage in a conflict of laws analysis." *Erwin v. Cotter Health Centers*, 161 Wash.2d 676, 692 (2007) (citations omitted). Consequently, and as this district court has noted, choosing the applicable law is a two-part inquiry: first, a court must determine whether there is an actual and meaningful difference between the potentially applicable laws; and second, a court must determine whether the parties' choice-of-law is actually effective. *Carideo v. Dell, Inc.*, 520 F.Supp.2d 1241, 1244-45 (W.D. Wash. 2007).

With respect to the first inquiry, there is no question that an actual conflict exists between Washington law and the law of other states that are implicated in this lawsuit. In Washington, a class-action waiver is unenforceable in certain circumstances. *Scott v. Cingular Wireless*, 160 Wash.2d 843, 859 (2008). On the other hand, in Virginia, Illinois,

ORDER
PAGE - 5

and Alabama – three states that are potentially applicable in the instant case – courts have upheld class action waivers based on a strict interpretation of the FAA, or when the corporate defendants have agreed to pay the administrative fees associated with arbitration. *See*, *e.g.*, *Gay v. CreditInform*, 511 F.3d 369, 390-92 (3d Cir. 2007) (applying Virginia law); *Hutcherson v. Sears Roebuck & Co.*, 342 Ill.App. 3d 109, 121-124 (2003) (applying Illinois law); *Billups v. Bankfirst*, 294 F.Supp.2d 1265, 1276-77, n. 6 (M.D. Ala. 2003) (applying Alabama law). Indeed, there is a split of authority in this country over the enforceability of class-action waivers. *See Scott*, 160 Wash.2d at 850-851 (collecting cases).

As a result, the Court must ask whether the parties' express contractual choice-of-law is effective. Washington applies § 187 of the *Restatement* to make this determination. *See Erwin*, 161 Wash.2d at 694. Section 187(2) of the *Restatement* specifically provides:

(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

*Restatement (Second) of Conflict of Laws* § 187 (1971).

Here, there is no dispute that Defendants' chosen state has a substantial relationship to the parties of the transaction. The states are those in which the individually named Plaintiffs respectively reside. Therefore Plaintiffs must show that the elements of § 187(2)(b) of the *Restatement* are met.

        1. <u>Washington Law Governs Absent an Enforceable Choice-of-Law Clause</u>

As the Washington Supreme Court recently explained, the first inquiry in the choice-of-law analysis is to determine whether Washington law would apply without the provision. *McKee v. AT&T Corp.*, 164 Wash.2d 372, 384 (2008). Washington courts have applied various tests when making this inquiry, including the "most significant relationship" test from

§ 188 of the *Restatement*. This test specifies that courts should consider: (1) the place of contracting, (2) the place of negotiation of the contract, (3) the place of performance, (4) the location of the subject matter of the contract, and (5) the domicile, residence, or place of incorporation of the parties. *Restatement*, *supra*, § 188; *see also Mulcahy v. Farmers Ins. Co. of Washington*, 152 Wash.2d 92, 101 (2004) (employing the same five factors).

Other courts have examined factors outside of those listed in the *Restatement*. For example, this district court held that in a class-action lawsuit involving plaintiffs from across the nation, "the place of injury is of lower importance . . . In such a case, the state in which *the fraudulent conduct arises* has a stronger relationship to the action." *Kelley v. Microsoft Corp.*, 251 F.R.D. 544, 552 (W.D. Wash. 2008) (emphasis added). Likewise, a Washington state court acknowledged that even though a defendant corporation was incorporated outside of Washington state, Washington law nevertheless applied because "all defendants reside or conduct business in Washington . . . a Seattle attorney was involved in preparing and reviewing many transaction documents . . . and [] many of the acts of alleged fraud occurred in Washington." *Ito Intern. Corp. v. Prescott, Inc.*, 83 Wn. App. 282, 290 (1996).

In the instant case, the Court finds that the first four factors in the *Restatement* analysis are neutral. The reality of the situation presented by this case is that there is simply no place of contracting, no place of negotiation of the contract, no place of performance, and no central location of the subject matter of the contract. Instead, Defendants sent the WSAs to customers who were existing AT&T Wireless customers, and there is no evidence that the Plaintiffs repeatedly communicated with Defendants to either change or otherwise modify their plans. Therefore no true negotiation between the parties took place. Additionally, in a case involving wireless phones, there is no central place of performance, as Defendants undoubtedly have satellite towers all across the country, and customers often use their phones in multiple states. Indeed, wireless phone use is a nation-wide practice.

With respect to the last factor, this weighs in favor of applying Washington law. Defendants concede that AT&T Wireless is a Washington corporation, and Plaintiffs also allege that Washington was the primary residence of AT&T Wireless' officers, directors, and

legal department. (Dkt. #136 at 19). Defendants do not dispute these contentions. In addition, at least one named Plaintiff of the putative class is a Washington resident.

Moreover, when considering that AT&T Wireless has strong connections to this state, application of Washington law is the logical choice. Plaintiffs indicate that the AT&T Wireless executives responsible for "designing, implementing, and operating [AT&T Wireless'] national network, including network footprint expansion plans, capacity path growth, and the deployment strategy for the company's next generation wireless network" were located in Redmond, Washington. (Decl. of Coluccio, Ex. CC). Plaintiffs further indicate that the AT&T Wireless executives responsible for "marketing strategy and programs, including products and offers, advertising and marketing communications, partnerships and direct marketing" were also located in Redmond. (*Id*., Ex. DD). In addition, AT&T Wireless' legal department was located in Washington, and it appears that the initial drafts of the arbitration provisions were drafted here. (*Id.*, Ex. L, Dep. of Berinhout, 105:17-22; 111:17-113:1). Defendants also do not dispute these contentions.

Nevertheless, counsel for Defendants indicated at oral argument that an unpublished Ninth Circuit case is controlling on this issue. *See In re Detwiler*, 305 Fed.Appx. 353 (9th Cir. 2008). In that case, a customer to a telecommunications provider argued that the district court erred in holding that Florida law applied if no choice-of-law clause existed in the parties' contract. The Ninth Circuit affirmed the district court's decision because the majority of the *Restatement* factors weighed against the customer, who was seeking to apply Washington law. The Ninth Circuit held that Washington law would not apply because "Florida is the place of contracting, the place of negotiation, the place of performance, the location of the subject matter, and the residence of one of the parties." *Id.* at 355. Significantly, the customer had contact with the telecommunications provider 11 times over a period of six years, and had received several guides regarding her agreement.

The Court finds that *Detwiler* is not controlling. As explained previously, the Plaintiffs in this case did not have extensive contacts or negotiations with the Defendants, and the first four factors of the *Restatement* simply have no compelling effect. Conversely, the only factor

ORDER
PAGE - 8

that clearly applies weighs in favor of applying Washington law. Ultimately, the Court agrees with Plaintiffs' counsel's characterization during oral argument that Washington's choice-of-law analysis is a "messy test." It is clear that Washington courts examine various factors in determining whether Washington law would apply.

As a result, and similar to the *Kelley* and *Prescott* cases above, it is clear that a substantial portion of the allegedly fraudulent activity occurred in Washington. The application of Washington law in this case "would encourage Washington residents involved in business transactions to behave responsibly." *Prescott*, 83 Wn. App. at 290. Coupled with the fact that the *Restatement* analysis weighs slightly in favor of applying Washington law, the Court finds that Washington has the most significant relationship to this case, and that Washington law would apply absent a choice-of-law provision in the WSAs.

2. Fundamental Public Policy of Washington

There can be no doubt that Washington has a strong public policy of refusing to enforce exculpatory class action bans. *See Scott*, 160 Wash.2d at 859.[2] This policy has been reinforced by *McKee*, wherein the court stated that Washington has a "fundamental public policy to protect consumers through the availability of class action." *McKee*, 164 Wash.2d at 385. The *McKee* court further stated that "Washington's strong [CPA] policy favoring class adjudication of small-dollar claims is a 'fundamental policy' contemplated by [the *Restatement*]." *Id.* at 386.

Here, there is no doubt that the claims alleged by Plaintiffs implicate a fundamental public policy of Washington. A prohibition on the Plaintiffs' ability to initiate a class-action lawsuit would violate the rights protected by the Washington CPA and the case law that has interpreted these rights. Furthermore, and as mentioned above, there exists the possibility that in at least three of the jurisdictions that Defendants contend apply in this case, a court may

---

[2] In *Carideo*, this district court found that the analysis of whether a contract would violate a fundamental public policy is similar to whether it would be substantively unconscionable. 520 F.Supp.2d at 1245. However, the *McKee* court found that "[t]his question is different than determining whether a class action ban under some circumstances is substantively unconscionable." 164 Wash.2d at 385. The Ninth Circuit remanded the *Carideo* decision in light of *McKee*. Accordingly, the Court separates the analysis as well.

ORDER
PAGE - 9

uphold class-action waivers under certain circumstances. *See Gay*, 511 F.3d at 392; *Hutcherson*, 342 Ill.App. 3d at 121-124; *Billups*, 294 F.Supp.2d at 1276-77, n. 6. Therefore the Court finds that this element of § 187 of the *Restatement* has been met.

### 3. Washington's Materially Greater Interest

The last factor for this Court to consider is whether Washington has a materially greater interest in adjudicating this dispute than the other potentially applicable states. The Court has effectively already performed this analysis in its discussions above. There can be no doubt that Washington has an interest in regulating the conduct of businesses that reside in this state. This interest is materially greater than the interests of the eight other states whose laws Defendants contend apply in this case. In those states, the only connection to this lawsuit is that the individually–named Plaintiffs reside there. Defendants do not conduct any significant business activity in such states, and therefore the states have limited interest in adjudicating the case at bar.

As a result, because the elements of § 187(2) have been met, Washington law shall apply in this case.

**D. Unconscionability**

Washington law recognizes two types of unconscionability, substantive and procedural. *Zuvver v. Airtouch Communications, Inc.*, 153 Wash.2d 293, 303 (2004) (citations omitted). "Substantive unconscionability involves those cases where a clause or term in the contract is alleged to be one-sided or overly harsh, while procedural unconscionability relates to impropriety during the process of forming a contract." *Schroeder v. Fageol Motors, Inc.*, 86 Wash.2d 256, 260 (1975) (citation omitted). In Washington, courts may hold that contracts are unenforceable based upon substantive unconscionability only. *See Scott*, 160 Wash.2d at 854, n.4 ("Because we find the class action waiver substantively unconscionable, we find it unnecessary to address plaintiffs' claims of procedural unconscionability.").

### 1. Substantive Unconscionability in Washington

Both parties are fully aware that the Washington Supreme Court has recently held that a class-action waiver provision in an arbitration agreement is substantively unconscionable. *See Scott*, 160 Wash.2d at 859. Other recent decisions involving class-action waivers and applying Washington law have found similarly. *See Lowden v. T-Mobile USA, Inc.*, 512 F.3d 1213, 1219 (9th Cir. 2008); *Luna v. Household Finance Corp. III*, 236 F.Supp.2d 1166, 1179 (W.D. Wash. 2002); *Riensche v. Cingular Wireless, LLC*, 2006 WL 3827477, *12 (W.D. Wash. 2006).

Despite this recent case law, Defendants contend that there is no categorical rule that all class-action waivers contained in arbitration provisions are substantively unconscionable. Defendants argue that *Scott* only bans class-action waivers where such a waiver would prevent vindication of consumer rights secured by the Washington CPA. Defendants further point out that the court in *Scott* held that it could "certainly conceive of situations where a class action waiver would not prevent a consumer from vindicating his or her substantive rights under the CPA and would thus be enforceable." *Scott*, 160 Wash.2d at 860, n.7.

The Court agrees that there is no *per se* ban on a class-action waiver. As this district court has previously held, "*Scott* requires the court to examine the enforceability of a class-action waiver given the totality of the circumstances." *Carideo*, 520 F.Supp.2d at 1243. As a result, the heart of this dispute is whether the specific terms of the class-action waivers are substantively unconscionable.

### 2. Cingular and AT&T's class-action waiver provisions

Defendants contend that there are several aspects of the applicable arbitration provisions in the WSAs that make them uniquely "pro-consumer," and therefore enforceable. These features include, among other things, the following incentives: (1) cost-free arbitration wherein Defendants agree to pay all filing, administration, and arbitrator fees; (2) the option to bring a claim in small claims court; (3) the availability of punitive damages; (4) a guaranteed minimum recovery of at least $5,000 under certain conditions; and (5) the

availability of double attorneys' fees under certain conditions while Defendants simultaneously disclaim their right to seek attorneys' fees. (Dkt. #133 at 16-17).

Defendants' expert witness Richard A. Nagareda, a law professor at Vanderbilt University, also testifies that he has "never seen an arbitration provision that has gone as far as this one to provide incentives for consumers and their prospective attorneys to bring claims." (Dkt. #53, Decl. of Nagareda, ¶ 11). Mr. Nagareda continues that the applicable arbitration provision "reduces dramatically the cost barriers to the bringing of individual consumer claims . . . and provides financial incentives for consumers (and their attorneys, if any) to pursue arbitration in the event that they are dissatisfied with whatever offer Cingular has made to settle their disputes." (*Id*.).

Notwithstanding these arguments and the allegedly unique and "pro-consumer" nature of the agreements between AT&T and Cingular and their customers, the Court finds that the class-waiver provisions are substantively unconscionable for the following five reasons.

First, the class-action waiver serves to protect Defendants "from legal liability for any wrong where the cost of pursuit outweighs the potential amount of recovery." *Scott*, 160 Wash.2d at 855. Here, there can be no doubt that the purported class in this case alleges injuries that consist of small sums of money. Specifically, Plaintiffs' second amended complaint describes the putative class members' damages as ranging from $4.99 to $175. (Second Am. Compl., ¶¶ 7-21). Such small claims are undoubtedly dwarfed by the legal complexity presented by the facts alleged in Plaintiffs' complaint. These include claims that Cingular, a multi-billion dollar corporation, intentionally degraded AT&T's pre-existing wireless network in order to exponentially increase their profits by assigning small fees to customers switching to the new network. There can be no question that the cost of pursuit would be prohibitively expensive for a customer proceeding on an individual basis.

Furthermore, Plaintiffs submit the declarations of several consumer lawyers across the country, all of whom testify "that the relatively small amount in controversy makes cases against large corporations such as AT&T impractical to pursue on an individual basis." (Dkt. #136 at 10). Each consumer lawyer additionally testifies that he or she would not represent

the named Plaintiffs in individual actions, either in court or in arbitration. (*Id*.). The Court finds the testimony of North Carolina lawyer Jerome Hartzell particularly compelling. He states that "the hourly charge would generally or invariably exceed the entire amount in controversy." (Dkt. #43, Decl. of Hartzell, ¶ 23). "[N]o lawyer concerned with *ethical propriety* would be comfortable charging a client by the hour for such services." (*Id*. at ¶ 34) (emphasis added).

Given the significant disparity presented by the facts of this case, the Court finds it clear that the cost of pursuit significantly outweighs the potential recovery if each of the Plaintiffs was to proceed on an individual basis. Indeed, "[t]he *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30." *Carnegie v. Household Intern., Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) (emphasis in original) (J. Posner).

The second reason in support of a finding of substantive unconscionability is that Defendants significantly overstate the "premiums" contained in their WSAs. The Court gives no weight to the fact that Defendants will pay for arbitration fees as well as attorneys' fees in the event a customer wishes to pursue individual arbitration. As *Scott* clearly held, "[s]hifting the cost of arbitration to Cingular does not seem likely to make it worth the time, energy, and stress to pursue such individually small claims." *Scott*, 160 Wash.2d at 855-56; *see also McKee v. AT&T Corp.*, 164 Wash.2d at 398 ("The agreement allows for small claims court action, but even the availability of small claims court or low-cost arbitration does not make it practicable for an individual to pursue such small amounts.").

In addition, Defendants also overstate the provision in their WSAs that allow consumers to potentially recoup a $5,000 award. Defendants repeatedly argue throughout their briefings that this $5,000 minimum payment is clearly a meaningful recovery that would turn the concept of unconscionability on its head. However, the $5,000 payment is awarded *only upon the condition* that "the arbitrator awards the customer more than [AT&T Mobility's] last written settlement offer before an arbitrator was selected." (Dkt. #133 at 16) (internal quotations omitted). Therefore the award is not guaranteed. Defendants are in full control of

ORDER
PAGE - 13

ensuring that such an amount is never awarded by offering a settlement offer that is significantly lower than $5,000, but remains significantly higher than the nominal claims that the individuals are bringing in this case. This reasoning applies with equal force to the provision in Defendants' WSAs that awards double attorneys' fees should this condition occur. As a result, and as the *Scott* court pointed out, while these "premiums" are laudable, "it appears . . . that these provisions do not ensure that a remedy is practically available." *See Scott*, 160 Wash. 2d at 856.

Third, and perhaps most compelling, is that the Court has tangible evidence which reveals that Defendants' "pro-consumer" provisions are not having their intended effect. For example, Plaintiffs indicate that since 2003, fewer than 200 consumer arbitrations involving Defendants have been conducted nationwide, and only 265 small claims court cases have been filed against Defendants nationwide. (Dkt. #136 at 33). To place this in perspective, it is worthwhile to reiterate that Defendants' client base is currently over 70 million customers. Therefore the actual percentage of customers utilizing Defendants' allegedly "pro-consumer" provisions represents an infinitesimal amount.[3]

Plaintiffs further point out that the Foundation for Taxpayer and Consumer Rights – a non-profit consumer advocacy organization – received more than 4,700 complaints regarding service after the merger, and over 1,800 web-based complaints within 24 hours of the press announcement that followed the filing of this class action lawsuit. (Dkt. #144, Decl. of Heller, ¶¶ 8, 11). Thus, the miniscule amount of customers pursuing arbitration proves that the customers are either unaware of their right to take advantage of these "pro-consumer" provisions, or the customers have no incentive to bring their claims against Defendants given the prohibitively expensive costs of individual adjudication. In either circumstance, Defendants are utilizing the provisions in the WSAs to effectively exculpate themselves from any potential liability for unfair or deceptive acts or practices in commerce, conduct that is expressly barred by the Washington Supreme Court. *Scott*, 160 Wash.2d at 854 ("Contract

---

[3] Defendants report that they have conducted nearly 270 arbitrations. Regardless, the tiny fraction of those pursuing individual arbitration remains essentially the same.

ORDER
PAGE - 14

provisions that exculpate the author for wrongdoing, especially intentional wrongdoing, undermine the public good."). This Court will not condone such a broad and exculpatory practice.

Relatedly, and in light of *Scott's* holding that not all class-waivers are *per se* unconscionable, Defendants' consistently challenged Plaintiffs during oral argument to imagine an arbitration provision that would not violate substantive unconscionability. No such burden exists. Plaintiffs must only show that the WSAs in this case are shielding Defendants from a substantial amount of potential liability. Defendants attempts to focus this Court's attention on the "pro-consumer" provisions of the WSAs are not persuasive.

The fourth reason in support of a finding of substantive unconscionability is that class action lawsuits are necessary and effective avenues for consumers whose economic positions vis-à-vis their corporate opponents would not allow them to proceed on a case-by-case basis. Washington clearly has "a state policy favoring aggregation of small claims for purposes of efficiency, deterrence, and access to justice." *Scott*, 160 Wash.2d at 851. "[A] class-based remedy is the only effective method to vindicate the public's rights." *Id.* at 852.

Nevertheless, Defendants contend that class action settlements are often worth nothing to individuals, given that the actual award to individuals is nominal. However, the actual award to the individuals that comprise a class is only one of the principal aims of a class action lawsuit. Another primary purpose of a class action lawsuit is to allow "[p]rivate citizens [to act] as private attorneys general in protecting the public's interest against unfair and deceptive acts and practices in trade and commerce." *Scott*, 160 Wash.2d at 853 (citing *Lightfoot v. MacDonald*, 86 Wash.2d 331, 335-36 (1976)). Curbing fraudulent business practices is a fundamental principle of any class action lawsuit. As the *Scott* court noted when citing a California Supreme Court decision:

> Individual actions by each of the defrauded consumers [are] often impracticable because the amount of individual recovery would be insufficient to justify bringing a separate action; *thus an unscrupulous seller retains the benefits of its wrongful conduct*. A class action by consumers produces several salutary by-products, *including a therapeutic effect upon those sellers who indulge in fraudulent practices*, aid to legitimate business enterprises by *curtailing illegitimate competition*, and avoidance to

the judicial process of the burden of multiple litigation involving identical claims. The benefit to the parties and the courts would, in many circumstances, be substantial.

*Scott*, 160 Wash.2d at 852 (citing *Vazquez v. Superior Court of San Jouquin County*, 4 Cal. 3d 800, 808 (1971)) (emphasis added).

Lastly, the Court recognizes that recent jurisprudence views class-action waivers unfavorably. Dating back to the beginning of 2008, there have been at least seven different courts in five different jurisdictions that have refused to enforce class-action waivers. *See Hoffman v. Citibank (South Dakota), N.A.*, 546 F.3d 1078, (9th Cir. 2008); *In re Apple & AT&T Antirust Litig.*, 596 F.Supp.2d 1288 (N.D. Cal. 2008); *In re American Express Merchants' Litigation*, 554 F.3d 300 (2d Cir. 2009); *McKee v. AT&T Corp.*, 164 Wash.2d 372 (2008); *Olson v. The Bon, Inc.*, 144 Wn. App. 627 (2008); *Fiser v. Dell Comp. Corp.*, 144 N.M. 464 (2008); *Woods v. QC Financial Services*, --- S.W.3d ---, 2008 WL 5454124 (Mo. App. E.D. 2008). And as the Court noted above, even the *Carideo* case in which Defendants heavily rely upon has recently been remanded by the Ninth Circuit. *See In re Carideo*, 550 F.3d 846 (9th Cir. 2008). This ruling is therefore consistent with the modern trend.

As a result, the Court finds that class waiver provisions in the instant case are unconscionable. Defendants are effectively exculpated from any liability as a result of the provisions contained in their WSAs. This conduct contravenes Washington's fundamental public policy favoring the availability of class actions as a mechanism for enforcing a consumer's rights.

Defendants indicate that if the class-action waiver provision is unenforceable, the entire arbitration agreement should be unenforceable. Accordingly, the Court finds that all language in the applicable WSAs touching upon arbitration is unenforceable under Washington law.

**E. Preemption**

Defendants nevertheless argue that the FAA preempts the substantive unconscionability laws of Washington State. In support of this argument, Defendants indicate that § 2 of the FAA mandates that arbitration provisions "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. §

2. Defendants argue that this section preempts general principles of contract law where those doctrines are employed in a way to subject arbitration clauses to special scrutiny. (Dkt. #133 at 53) (citing *Iberia Credit Bureau, Inc v. Cingular Wireless LLC*, 379 F.3d 159, 167 (5th Cir. 2004)). In other words, courts "may not invalidate arbitration agreements under state laws applicable *only* to arbitration provisions." *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687 (1996) (emphasis in original).

However, the arguments raised by Defendants have been squarely rejected by the Ninth Circuit. For example, in *Shroyer v. New Cingular Wireless Servs., Inc.*, the court recognized that Congress never intended to place arbitration agreements on a different footing than other contracts. 498 F.3d 976, 989 (9th Cir. 2007); *see also Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404, n. 12 (1967) ("As the 'savings clause' in § 2 indicates, the purpose of Congress . . . was to make arbitration agreements as enforceable as other contracts, but not more so."). Nonetheless, the Court held that this purpose "does not appear to be frustrated or undermined in any way by a holding that class arbitration waivers in contracts of adhesion, like class action waivers in such contracts, are unconscionable." *Shroyer*, 498 F.3d at 990. The court concluded "that applying California's generally applicable contract law to refuse enforcement of the unconscionable class action waiver in this case *does not stand as an obstacle to the purposes or objectives of the [FAA].*" *Id.* at 993 (emphasis added).

The Ninth Circuit subsequently upheld *Shroyer* in a case implicating Washington State's law on substantive unconscionability. *See Lowden v. T-Mobile USA, Inc.*, 512 F.3d 1213 (9th Cir. 2008). The court expressly held that "[j]ust as the FAA does not preempt California's unconscionability law, *it does not preempt Washington's unconscionability law.*" *Id.* at 1221 (emphasis added). The court based this finding on the concern that "when the potential for individual gain is small, few if any plaintiffs will pursue either individual arbitration *or* litigation, thereby greatly reducing the aggregate liability a company faces when it has exacted small sums from millions." *Id.* (emphasis in original).

The same concerns raised in *Shroyer* and *Lowden* apply with equal force here. The Court is not extending or otherwise employing a unique rule of law in finding that the class-

ORDER
PAGE - 17

action waiver provisions in this case are substantively unconscionable. In fact, the principles utilized by the Court are general doctrines of unconscionability law that would apply to any two parties to a contract. The fact that the individuals here are precluded from proceeding as a class is not strictly limited to situations where such a provision is embedded in an arbitration provision. Whenever a party is effectively exculpating itself from allegedly fraudulent activity, general principles of unconscionability would potentially apply.

Defendants attempt to make one last plea to escape from the umbrella of these holdings by arguing that a recent Supreme Court case supersedes *Shroyer* and *Lowden*. *See Preston v. Ferrer*, 128 S.Ct. 978 (2008). This argument is not persuasive. In *Preston*, the Supreme Court addressed the narrow issue of whether a state statute assigning primary jurisdiction to a state labor commission is superseded by the FAA. *Id.* at 981. In holding that the statute was indeed preempted by the FAA, the Court upheld the general principle in favor of arbitrating disputes. *Preston* did not discuss or otherwise impact the more specific principle that "generally applicable contract defenses such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements[.]" *Casarotto*, 517 U.S. at 687.

### **III. CONCLUSION**

Having reviewed the relevant pleadings, the declarations and exhibits attached thereto, and the remainder of the record, and having considered the oral argument of the parties, the Court hereby finds and ORDERS:

(1) "Defendants' Amended Motion to Compel Arbitration Pursuant to the Federal Arbitration Act and to Dismiss Action" (Dkt. #133) is DENIED. Defendants are directed to file an answer to Plaintiffs' second amended complaint no later than thirty (30) days from the date of this Order. Once Defendants respond, the Court will issue its initial scheduling order.

(2) The Clerk is directed to forward a copy of this Order to all counsel of record.

DATED this 22nd day of May, 2009.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

ORDER
PAGE - 18